**Wilfredo ROSADO SERRANO,**
**et al., Plaintiff,**

v.

**E.I. DUPONT de NEMOURS**
**AND COMPANY, INC.,**
**et al., Defendants.**

**Civ. No. 90–1562 (JP).**

United States District Court,
D. Puerto Rico.

Aug. 24, 1992.

Juan A. Hernández Rivera, Raymond Rivera Esteves, San Juan, P.R., for plaintiff.

Manuel A. Guzmán Rodríguez, McConnel, Valdés, Kelley, Sifre, Griggs & Ruiz-Suria, San Juan, P.R., Jorge L. Córdova, Jr., Rivera, Tulla & Ferrer, Mario M. Oronoz, Hato Rey, P.R., Steven C. Lausell-Stewart, Jiménez, Graffam & Lausell, San Juan, P.R., for defendants.

## OPINION & ORDER

PIERAS, District Judge.

The Court has before it the Motion for Summary Judgment filed by defendant E.I. Dupont de Nemours and Company, Inc. on April 3, 1991. For the reasons set forth below, the motion is hereby GRANTED.

### I. Background

Plaintiff Wilfredo Rosado Serrano worked at the Agricultural Experimental Station of the University of Puerto Rico located in Corozal, Puerto Rico, from 1975 to 1989. As part of his duties, he was required to come into contact with various agricultural and chemical products, primarily pesticides and herbicides, manufactured and distributed by defendants. He alleges that as a result of his exposure to these substances he contracted a disease known as generalized neuropathy.[1] He further alleges that defendants failed to adequately warn him about the ill effects of exposure to these substances since its warnings on the containers in which the chemicals were sold appeared only in English and

---

1. "Neuropathy" is defined as "[a]ny nervous system disease." *Gould Medical Dictionary* (3d ed. 1972) at 1030. If the disease is produced within many nerves simultaneously, it is a type of the disorder known as "polyneuropathy." *The Merck Manual* (15th ed. 1987) at 1443. This condition is generally caused by exposure to toxic agents, including many solvents and indus-

trial poisons." *Id.* at 1443–44. Plaintiff alleges that as part of his duties at the Agricultural Experimental Station he was required to spray various chemical products on plants. He alleges that since he was without any protective equipment while performing this work, his bare skin often came into contact with the diluted sprays.

plaintiff does not read or understand English.

On January 25, 1983, while working with a hand saw and bending over, plaintiff injured his back. He reported to the State Insurance Fund (hereinafter "SIF") for treatment and was promptly discharged. Approximately one year later plaintiff again reported to the SIF for treatment, complaining of persistent back pain. During this visit, he was examined by Dr. Ivette Matos de Galíndez, who ordered electrodiagnostic studies of plaintiff's upper and lower extremities. These studies, which were conducted by Dr. José Eddie Bisbal, revealed signs of generalized neuropathy and a generalized degenerative neuropathic condition. In a sworn statement accompanying defendants' motion for summary judgment, Dr. Bisbal explained:

> On November 17, 1983, and after examination of Mr. Wilfredo Rosado Serano [sic], I formed the opinion that findings of certain medical tests were compatible with the diagnosis of generalized neuropathy and that such condition was probably related to fertilizers and plaguicides that Mr. Rosado used in his place of employment....
>
> ... [O]n that occasion *I discussed with Mr. Rosado my diagnosis regarding generalized neuropathy as well as its probable cause, that is, contact with the aforementioned substances he used in the course of his employment.* It was Mr. Rosado who mentioned his contact with these substances when I interviewed him about my findings.

(Emphasis added.) These findings were delivered to Dr. Matos, who concluded her report, which was dated January 30, 1984, by commenting:

> For [a] long time this patient has been contact at his work with gerbicides [sic], fertilizers and other similar products. The generalized neuropathy is probably related to this.

As a result, it would appear that as of late 1983 or early 1984 plaintiff was aware of his condition and of its probable cause—that is, exposure to the various chemicals manufactured by defendants.

Plaintiff contends, however, that he "did not discuss at any time the details of the reports of Dr. José E. Bisbal and Dr. Ivette Matos." Sworn Statement of Wilfredo Rosado Serrano at 1. Plaintiff attached to his Opposition to defendant's motion sworn statements of both Dr. Matos and Dr. Bisbal. In the former, which is uncontroverted, Dr. Matos states that she did not discuss the findings of the electrodiagnostic test compatible with signs of generalized neuropathy with plaintiff. Sworn Statement of Dr. Ivette Matos at 2. The statement filed by Dr. Bisbal, his second in this case, seeks to clarify his prior statement. The second statement reads, in its entirety:

> I, Dr. José Eddie Bisbal, of legal age, physiatrist by profession, and with offices in Bayamón, Puerto Rico states as follows:
>
> 1. My personal circumstances are those described above.
>
> 2. *On March 20, 1991, in San Juan, Puerto Rico I signed a sworn statement prepared by the law firm of McConnell, Valdez, Kelly, Sifre & Ruiz Suria.*
>
> 3. In the sworn statement mentioned above I said that on November 17, 1983, after the examination of Mr. Wilfredo Rosado Serrano, I formed the opinion that the findings were compatible with the diagnosis of generalized neuropathy, probably related to the fertilizers [and] plaguicides that Mr. Rosado used in his place of employment.
>
> 4. Also, I further stated that on that occasion my diagnosis regarding a generalized neuropathy as its probable cause by contact with the aforementioned substances he used in the course of his employment, was by information that Mr. Rosado mentioned to me of his contact with those substances. No further examination was made at that time.
>
> 5. *I want to clarify by this sworn statement* that my diagnosis was according to an electromyographic exam practiced to Mr. Wilfredo Rosado Serrano.
>
> 6. *That I did not have at the time of the mentioned diagnosis evidence and do not have at present any record of such patient (Mr. Rosado Serrano) in*

*my office to ascertain the conclusion that the condition that he developed is the unique result of the contact with fertilizers, plaguicides, pesticides, herbicides or other chemicals.*  .

7. When I referred in the statement of Physical Therapy Center of Santa Rosa ... as "probably related to fertilizers and plaguicides that he used at his work," it was in accordance that his condition could be a consequence of his exposure to those chemicals. I also must add that many other factors could produce a generalized neuropathy, and any one of those could have been possible at the time. So *a categorical conclusion that his signs of generalized neuropathy were as a result of his contact with those chemicals on [sic] 1983 as a fact, could not be made and would have been premature at that time.*

8. Mr. Rosado Serrano visited me only two times, referred by Dr. Ivette Matos, specifically to perform electrodiagnostic tests. To make a definite diagnosis of a generalized neuropathy as a result of his exposure to plaguicides and fertilizers, I would have had to perform as a minimum, a toxicology test, and this was not made in this patient at that time.

9. Also, I want to state clearly that a positive electromyographic test as to a generalized neuropathy could be due to many others [sic] causes that could produce such condition and not especifically [sic] to plaguicides or fertilizers.

10. My findings in the electrodiagnostic studies performed on 1983 ... were prepared for Dr. Ivette Matos to analize [sic] a lower back condition. So *such findings on the electromyographic test and NCV, compatible with signs of generalized neuropathy were not discussed with Mr. Rosado Serrano. If any comment was made at that time [it] was with the exclusive purpose of giving the patient orientation in relation to his lower back condition.*

11. Finally, after looking at the Defendant's Memorandum Scheduling Conference Call and E.I. Du Pont de Nemours and Company, Inc. summary judgment [motion], I do not agree with the conclusion that the defendants lawyers made about my interpretation of the sworn statement that I signed on March 20, 1991. . . .

12. *My final opinion is that Mr. Rosado Serrano in 1983 was informed that his neuropathic condition could be among many other causes, related to his exposure to chemicals [sic] substances, because at that time I was not certain if his condition was in fact a consequence of the fertilizers and plaguicides to which he was exposed at his work.* Other diagnostic tests such as: blood and serum levels, muscles or skin biopsies were indispensable for such diagnosis.

I DECLARE under the penalty of perjury, that the foregoing is true and correct this (20) date of April 1991, in Bayamón, Puerto Rico.

DR. JOSE EDDIE BISBAL

(Emphasis added.)

This second sworn statement signed by Dr. Bisbal is not artfully drafted. It begins with the statement that Dr. Bisbal's first sworn statement was prepared by lawyers and thereby intimates that it is not representative of his true recollections. The Court will not address this characterization. Dr. Bisbal's statements will be viewed as consistent with each other and true representations of his recollections. The second statement then seeks to clarify the first in several ways. Dr. Bisbal states that he was without sufficient information to conclude that plaintiff's condition was probably a result of his exposure to chemicals at work. In other words, Dr. Bisbal confirms that he told plaintiff that his condition was a result of his exposure to chemicals at work but clarifies that in his opinion the statement was not reliable.[2]

---

**2.** The Court has considered that Dr. Bisbal's second statement could be interpreted differently. It could be viewed as a statement that since he was without sufficient information to state to plaintiff that his condition was a result of his exposure to chemicals at work, he could never have made such a statement. He appears to reinforce this interpretation later when he states

Dr. Bisbal's sworn statements could be viewed as slightly contradictory.[3] After careful study, however, the Court concludes that they reliably provide information sufficient to make conclusions pertaining to what transpired between plaintiff and Dr. Bisbal. Viewed in the light most favorable to the non-movant (plaintiff), the sworn testimony shows that (i) Dr. Bisbal told plaintiff about the results of the electrodiagnostic tests; (ii) plaintiff informed Dr. Bisbal that he had been exposed to various fertilizers and other chemicals at his work; (iii) Dr. Bisbal commented to plaintiff, based on the limited information then at his disposal, that the condition was probably a result of his exposure to the chemicals. His comment cannot be characterized as a diagnosis. It does not constitute proof that the condition was a result of plaintiff's exposure to the various chemicals. It may have been incorrect. But it was made.

Plaintiff's own sworn statement supports these conclusions. He states that he did not discuss with Dr. Bisbal the *details* of his report. He thereby suggests that he did discuss the report with Dr. Bisbal generally. Dr. Bisbal's clarified version of the events is consistent with plaintiff's rendition. Finally, since her testimony is uncontradicted, the Court concludes that Dr. Matos never discussed the matter with plaintiff.

Feeling no symptoms related to the neuropathic condition at that time, plaintiff returned to work. Almost four years later, in November 1987, plaintiff returned to the SIF for treatment. As part of his treatment, plaintiff underwent a series of neurological examinations which resulted in a diagnosis that plaintiff's condition had worsened so that he suffered from polyneuropathy, sensory and autonomic, which was secondary to pesticide exposure. He received treatment from the SIF until he was discharged on November 6, 1990. As a result of his condition, he was forced to stop working. He initiated this action to recover his damages by the filing of a complaint dated April 19, 1990. Defendant E.I. Dupont de Nemours filed its motion for summary judgment alleging that plaintiff failed to file this action within applicable one year statute of limitations because he had knowledge of his injury and its cause in late 1983.

## II. Discussion

■ Rule 56(c) of the Federal Rules of Civil Procedure provides for the entry of summary judgment in a case where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Bren-*

that the "findings on the electromyographic test and NCV, compatible with signs of generalized neuropathy were not discussed with Mr. Rosado Serrano." This interpretation is undermined in several ways, however. First, it is flatly inconsistent with Dr. Bisbal's first sworn statement. Second, immediately after suggesting that he did not discuss the results of the electrodiagnostic studies with plaintiff Dr. Bisbal makes the extraordinary statement that "[i]f any comment was made at that time [it] was with the exclusive purpose of giving the patient orientation in relation to his lower back condition." In addition to being conjectural—and therefore inappropriate for a sworn statement filed in court (*accord* 10 Wright, Miller & Kane *Federal Practice and Procedure* Civil 2d § 2738 at 486 (footnote omitted) (Rule 56(e) limits the matter to be properly included in an affidavit to facts, not conclusions or conjecture)—the statement intimates that Dr. Bisbal discussed the results of the electrodiagnostic tests with plaintiff but only as a matter of curiosity and not in an effort to

complete the ordered study of his back problems. Finally, Dr. Bisbal later concludes that he *did* discuss the results of the electrodiagnostic tests with plaintiff, who he states was "informed that his neuropathic condition could be among many other causes, related to his exposure to chemicals [sic] substances."

3. Where conflicting affidavits raise a question of credibility, the disputed issue must be resolved at trial and summary judgment is precluded. 10 Wright, Kane & Miller, *supra,* at 505. It is of course very rare that the credibility of the testimony of an affiant is called into question by later testimony by the same individual. In this instance, the Court does not find that Dr. Bisbal's statements lack credibility because of their arguable inconsistencies. First, none of the parties have asserted that either statement lacks credibility for any reason. Second, the latter statement does appear to reasonably clarify the first.

*nan v. Hendrigan*, 888 F.2d 189, 191 (1st Cir.1989); *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 894 (1st Cir.1988). Summary judgment is appropriate where, after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, there is not the slightest doubt as to whether a genuine issue of material fact exists. *Kennedy v. Josephthal & Co.*, 814 F.2d 798, 804 (1st Cir.1987); *Peckham v. Ronrico Corp.*, 171 F.2d 653 (1st Cir.1948).

■ Plaintiff's negligence claim is governed by the damages provision of the Puerto Rico Civil Code, Article 1802, which provides:

> A person who by act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done. Concurrent imprudence of the party aggrieved does not exempt from liability, but entails a reduction of the indemnity.

31 L.P.R.A. § 5141; *see also Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) (discussing resort to state law in diversity actions). The statute of limitations governing actions under Article 1802 is supplied by Article 1868, which provides for a one year limitations period in all "[a]ctions to demand civil liability for grave insults or calumny, and for obligations arising from the fault or negligence mentioned in section 5141 of this title, from the time the aggrieved person had knowledge thereof." 31 L.P.R.A. § 5298. This period may be tolled, however, by the filing of a timely claim—within three years of learning that his injury is work-related—with the SIF. *Accord Ramirez Pomales v. Becton Dickinson & Co.*, 649 F.Supp. 913, 921 (D.Puerto Rico 1986) (citing 11 L.P.R.A. § 3).

In *Colón Prieto v. Géigel*, 115 D.P.R. 232, 247 (1984), the Supreme Court of Puerto Rico stated that this limitations period begins to run when the aggrieved party has knowledge of both his injury *and* its cause (or "author") such that the aggrieved party can address his action against the appropriate defendant. In *Delgado Rodriguez v. Nazario de Ferrer*, 88 J.T.S. 63, the Supreme Court of Puerto Rico stated that knowledge of the *injury*

> occurs when there exists some outward or physical signs through which the aggrieved party may become aware and realize that he has suffered an injurious aftereffect, which when known becomes a damage even if at the time its full scope and extent cannot be weighed. These circumstances need not be known in order to argue that the damage has become known, because its scope, extent and weight may be established later on during the prosecution of the remedial action.

*Id.* (citing H. Brau, *supra*, at 639–40).

Knowledge of the *author* occurs when the plaintiff knew or with the degree of diligence required by law should have known whom to sue. *See Santiago Hodge*, 833 F.2d 6, 8 (citations omitted); *see also Ramirez Pomales, supra*, 649 F.Supp. at 922 (plaintiff need not know "the exact culprit of the injury ...; it is enough for the plaintiff to know the cause of the injury.") The degree of diligence required is that of a "reasonable man" under like circumstances. H. Brau, *supra*, at 187. If a plaintiff's lack of knowledge is due to his own negligence or carelessness, the prescriptive period will commence on the date the alleged tort occurred. *Accord Barretto Peat, Inc. v. Luis Ayala Colón Sucrs.*, 896 F.2d 656, 658 (1st Cir.1990) (Pieras, D.J.). In addition, a victim is presumed to have knowledge of an injury at the time of the tortious act; therefore, the plaintiff has the burden of proving that he acquired knowledge of the act and its author at a later date. *Id.* (citing *Rivera Encarnación v. Estado Libre Asociado de Puerto Rico*, 113 D.P.R. 383, 385 (1982)); *see also Santiago Hodge, supra*, 833 F.2d at 7 (1st Cir. 1987) (citation omitted).

Plaintiff's contention that he did not have sufficient knowledge in late 1983 is intriguing but ultimately unpersuasive. The sworn testimony shows that plaintiff was informed by Dr. Bisbal in late 1983 that he had a generalized neuropathic condition and that it was probably a result of this exposure to chemicals at work. This

statement clearly conveyed to plaintiff his injury—generalized neuropathy. It also conveyed to him its possible authors—the companies who manufactured the chemicals with which plaintiff came in contact at his work. Through minimal investigation, which is required under the law, plaintiff could have ascertained the names of the relevant companies and instituted a lawsuit against them.

Plaintiff asserts that since Dr. Bisbal's comments were based on insufficient evidence they were not reliable. He suggests that since the information was not reliable, plaintiff did not possess adequate information on which to obtain knowledge of his injury and its cause. Plaintiff simply misconstrues the knowledge requirement. A plaintiff acquires knowledge of his injury and its author long before he has sufficient information to identify with certainty the exact individual or entity which caused his injury. *Accord Kaiser v. Armstrong World Industries*, 872 F.2d 512, 517 (1st Cir.1989) (plaintiff had sufficient knowledge when he was aware of the "likelihood" that his illness was asbestos related). Indeed, a plaintiff does not *know* that he has suffered an injury caused by a particular author until a judge or jury finds in his favor. Certainly, the statute of limitations cannot be triggered only when a plaintiff obtains a legal judgment. It is triggered when he has obtained sufficient information such that he knows or with the degree of diligence required by law should know whom to sue. Plaintiff possessed such information in late 1983. The statute of limitations in this case therefore expired long before plaintiff filed his complaint in this action. His filing of a claim before the SIF almost four years later was insufficient to toll the limitations period. As a result, plaintiff's action is time-barred and defendants' motion for summary judgment must be GRANTED.

IT IS SO ORDERED.